690 S.E.2d 783

SPARTANBURG REGIONAL MEDICAL
CENTER, Appellant/Respondent,

v.

ONCOLOGY AND HEMATOLOGY ASSOCIATES OF
SOUTH CAROLINA, LLC, d/b/a Cancer Centers
of the Carolinas, Respondent/Appellant,

and South Carolina Department of Health and
Environmental Control, Respondent.

and

Oncology Hematology Associates of South Carolina, LLC, d/b/a
Cancer Centers of the Carolinas, Respondent/Appellant,

v.

South Carolina Department of Health and
Environmental Control, Respondent,

and Spartanburg Regional Medical
Center, Appellant/Respondent.

No. 26785.

Supreme Court of South Carolina.

Heard Oct. 8, 2009.

Decided March 15, 2010.

80

James G. Long, III, Esquire, and Manton M. Grier, Jr., both of Nexsen Pruet, LLC, of Columbia, for Appellant–Respondent.

Carlisle Roberts, Jr., Nancy S. Layman, and Ashley C. Biggers, all of Columbia, for Respondent.

Lewis Smoak, of Ogletree Deakins Nash Smoak & Stewart, of Greenville, and Raymon E. Lark, Jr., of Austin & Rogers, of Columbia, for Respondent–Appellant.

Justice WALLER.

This is a cross-appeal from the circuit court's order which affirmed in result the decisions of the DHEC Board and the administrative law court (ALC) which awarded **two** Certificates of Need (CON) for the development of two additional radiation oncology centers in the Spartanburg/Union/Cherokee service area. We affirm as modified.

## PROCEDURAL BACKGROUND

In June 2002, appellant/respondent Spartanburg Regional Medical Center (SRMC) filed a CON application with respondent South Carolina Department of Health and Environmental Control (DHEC).[1] The CON was for a regional cancer center with a linear accelerator[2] to be located on the campus of Upstate Carolina Medical Center, an acute care hospital in Gaffney, Cherokee County. In October 2002, respondent/ap-

---

[1]. SRMC is a public hospital that is part of the Spartanburg Regional Health Services District, which is a political subdivision of South Carolina.

[2]. A linear accelerator is used by radiation oncologists to provide external radiation treatments to cancer patients. The CON Act defines "radiation therapy facility" as "a health care facility which provides or seeks to provide mega-voltage therapeutic services to patients through the use of high energy radiation." S.C.Code Ann. § 44–7–130(23) (2002).

pellant Oncology Hematology Associates of South Carolina, LLC, d/b/a Cancer Centers of the Carolinas (CCC) applied for a CON with DHEC for a radiation oncology center with a linear accelerator to be located near the campus of Mary Black Hospital (Mary Black) in Spartanburg.[3] CCC's planned linear accelerator at Mary Black would be approximately three miles from the Gibbs Regional Cancer Center (Gibbs Center), which is affiliated with SRMC and where the only other three linear accelerators in the service area are located.[4]

DHEC staff deemed the two CON applications competing.[5] DHEC held a project review meeting in February 2003 where both SRMC and CCC presented their proposed projects. On March 31, 2003, DHEC issued its decision letters which granted a CON for SRMC, but denied the CCC application.

Thereafter, CCC sought a contested case hearing before the ALC on both of DHEC's decisions. After months of discovery, the ALC held a five-day hearing in December 2003. In June 2005, the ALC issued its order upholding DHEC's decision to grant SRMC a CON, but reversing the DHEC decision to deny CCC's CON application. The ALC found the two CON applications were **not** competing "because granting both Applications will not exceed the need for linear accelerator facilities and the services which they provide." The ALC further found that both applications were consistent with the 2001 State Health Plan. Accordingly, the ALC ordered DHEC to issue a CON for each proposed project.

---

3. CCC is a private oncology practice established in 1976 with eight Upstate locations.

4. SRMC described its proposal for the linear accelerator in Cherokee County as a "Gibbs Center satellite." The proposed Gaffney location is over 20 miles from the Gibbs Center in Spartanburg. If SRMC's CON was solely approved, it would retain its status as the exclusive provider of radiation therapy in the tri-county service area of Spartanburg, Cherokee and Union. Conversely, if only CCC's application was approved, there would be four linear accelerators in the service area, all in Spartanburg County. If both CONs got approval, the service area would go from three to five linear accelerators.

5. See S.C.Code Ann. § 44–7–130(5) (2002) (defining "competing applicants" as two health care facilities who apply for CONs "to provide similar services or facilities in the same service area within a time frame as established by departmental regulations and whose applications, if approved, would exceed the need for services or facilities").

DHEC, SRMC and CCC all petitioned the South Carolina Board of Health and Environmental Control (the Board) for review of the ALC's decision. After a hearing in January 2006, the Board decided neither petitioner had proved the ALC had erred; therefore, the Board affirmed the ALC's decision.

SRMC and CCC petitioned the circuit court for judicial review of the Board's decision. A hearing was held in December 2007, and in January 2008, the circuit court affirmed the Board and ALC orders **in result.** SRMC and CCC filed cross-appeals, and the case was subsequently certified to this Court, pursuant to Rule 204(b), SCACR.[6]

## FACTS

Pursuant to the CON Act,[7] DHEC is designated as the sole state agency for control and administration of the granting of CONs which includes the preparation of the State Health Plan. *See* S.C.Code Ann. §§ 44–7–130(8) & –140 (2002). The purpose of the Health Plan is to outline the need for medical facilities and services in the State. The Health Plan is used as one of the criteria for reviewing projects under the CON program.

The parties agree that the 2001 Health Plan governs the instant case because it was the plan in effect when the CON applications were filed in 2002. *See* S.C.Code Ann. Regs. 61–15 § 504 (Supp.2008). The 2001 State Health Plan set the capacity of **each** linear accelerator at 7,000 treatments per year, with a realistic load being 80 percent of capacity, or 5,600 treatments per year.[8] Under the 2001 Health Plan, new linear accelerators would only be approved if the following conditions were met:

A. All **existing** units in the service area have performed at a combined use rate of 80 percent of capacity (5,600

6. The orders in this case have been stayed and therefore no additional linear accelerators have been added in the tri-county service area.

7. S.C.Code Ann. § 44–7–110 *et seq.* (2002).

8. Thus, the aggregate 80 percent threshold for the three linear accelerators in the Spartanburg/Union/Cherokee service area is 16,800 (5,600 * 3).

treatments per unit) for the year immediately preceding the filing of the applicant's CON application; **and**

B. **an applicant must project that the proposed service will perform a minimum of 3,500 treatments annually within three years of initiation of services, without reducing the utilization of existing [linear accelerators] in the service area below the 80 percent threshold.**

(Emphasis added). Consequently, an application for a linear accelerator CON in the tri-county service area at issue must establish that in its third-year of operations, the projected number of treatments for the new accelerator exceeds 3,500 treatments, and the existing accelerators will provide at least 16,800 treatments.

The 2001 State Health Plan outlined the following criteria under which a linear accelerator project would be reviewed:

a. Compliance with the Need Outlined in this Plan;
b. Community Need Documentation;
c. Distribution (Accessibility);
d. Projected Revenues;
e. Projected Expenses;
f. Financial Feasibility; and
g. Cost Containment.

*See* S.C.Code Ann. Regs. 61–15 § 802.

The Health Plan also specifically states that when evaluating CON applications for linear accelerators, "[t]he benefits of improved accessibility will be **equally weighted** with the adverse affects [sic] of duplication." (Emphasis added). Furthermore, the regulations clarify that while a project "does not have to satisfy every criterion" to be approved, "no project may be approved unless it is consistent with the State Health Plan." S.C.Code Ann. Regs. 61–15 § 801(3). DHEC assigns the relative importance of the project review criteria for the specific project applied for, and the relative importance "must be consistent for competing projects." [9] Regs. 61–15 § 801(2).

---

9. DHEC originally assigned slightly different relative importance of project criteria for the two projects at issue in the instant case. By the time of the project review meeting, however, the project criteria and their relative importance had been aligned for both projects.

SRMC filed its CON in June 2002 after determining that its three existing linear accelerators at the Gibbs Center had exceeded the 80 percent threshold for the 12–month time period of mid-May 2001 through mid-May 2002.[10] The portion of SRMC's CON application dealing with Need focused on the growing population of Cherokee County. In determining the cancer incidence rate for Cherokee County, SRMC utilized data from both the South Carolina Central Cancer Registry (the SC Registry) and Claritas Corporation (Claritas).[11] SRMC projected over 3,500 treatments in the third year for the Cherokee facility without reducing the existing Spartanburg linear accelerators' utilization below the 80 percent threshold.

In the Need portion of CCC's CON application, CCC asserted that the tri-county area had a projected need for two additional linear accelerators—its own proposed project **and** SRMC's Cherokee County proposal. Using Claritas population data along with **age-specific** cancer incidence data from the National Cancer Institute's Surveillance, Epidemiology, and End Results (SEER) program, CCC predicted that its proposed Spartanburg facility would perform 6,325 treatments in the third year without reducing SRMC's existing linear accelerators' utilization below the 80 percent threshold.

DHEC found that SRMC's application "better" met the following criteria than CCC's "competing" application:

Criterion 1. Need—Compliance with the State Health Plan;

Criterion 3b. Distribution (Accessibility)—The proposed service should be located so that it may serve medical underserved areas (or an underserved population segment) and should not unnecessarily duplicate existing service or facilities in the proposed service area; and

Criterion 22. Distribution—The existing distribution of the health service(s) should be identified and the effect of the

10. From May 2001 through May 2002, SRMC's three linear accelerators performed 18,278 treatments.

11. Pursuant to S.C.Code Ann. Regs. 61–15 § 202(11), population statistics provided in the CON application must be "consistent with those generated by the State Demographer, State Budget and Control Board." Claritas is a national company specializing in population and demographics data.

proposed project upon that distribution should be carefully considered to functionally balance the distribution to the target population.

*See* S.C.Code Ann. Regs. 61–15 § 802.

CCC thereafter filed for a contested case hearing before the ALC. The five-day hearing was extensive in terms of both witness testimony and exhibits. The parties took issue with many aspects of each other's proposed project, specifically targeting assertions regarding, *inter alia,* financial feasibility studies, service to indigent populations, desirability of the project from the community perspective, and expert qualifications of witnesses.

Without a doubt, however, the issue of need was central to the case because CCC argued that DHEC had erred at the outset by characterizing the applications as competing. *See* S.C.Code Ann. § 44–7–130(5) (defining "competing applicants" as two health care facilities who apply for CONs "to provide similar services or facilities in the same service area within a time frame as established by departmental regulations and whose applications, if approved, would **exceed the need** for services or facilities") (emphasis added). CCC contended that because the addition of two linear accelerators would not exceed the need for radiation therapy in the tri-county service area, both applications could be approved. CCC further argued that if only one application should be approved, its own better met the project criteria.

At the contested case hearing, both SRMC and CCC changed their third year projections from what they originally had proposed in their applications, although the methodology used was identical.[12] The projection methodology utilized was the following:

   (1) Calculate the anticipated number of new cancer cases in the service area by applying a cancer incidence rate to the projected population;

   (2) Assume that 60 percent of the new cancer cases would require radiation therapy with a linear accelerator; and

---

12. Both SRMC and CCC focused on the entire tri-county service area at the contested case hearing. In contrast, in the original CON applications, SRMC focused its projections on only Cherokee County, while CCC focused on Spartanburg and Union counties.

(3) Assume that each case, i.e., patient, would receive 25 radiation treatments.

Using state-specific data from the SC Registry,[13] SRMC projected that the total treatments **in 2006** for the entire tri-county service area would be 22,346.[14]  Using Claritas data and age-adjusted SEER data, CCC projected that the total treatments in 2006 for the entire tri-county service area would be 27,172.

According to SRMC, its projection of 22,346 treatments would support its existing three linear accelerators in Spartan-burg, plus the additional new one in Cherokee;  however, SRMC's projections would **not** support a fourth accelerator because that would require a projection of at least 23,800 treatments.[15]

CCC argued that its projection of 27,172 treatments would support SRMC's existing three linear accelerators in Spartan-burg, plus the addition of **both** a new SRMC accelerator in Cherokee and a new CCC accelerator in Spartanburg, because its projection exceeded 23,800 treatments.

CCC further argued that the Claritas and age-adjusted SEER data were more appropriate data sources for the projections because cancer incidence rises as a person ages. One of CCC's witnesses, Dr. Mark O'Rourke, a medical oncol-ogist, explained that "to estimate how many cancers are expected from a population, we need to know what proportion is in the different age groups."  Because SRMC did not use age-specific data for its projections, Dr. O'Rourke opined that

---

**13.** Data from the SC Registry is based upon the **actual number** of reported cancer cases in South Carolina.

**14.** Because the State Health Plan's provides that a linear accelerator would only be approved if the third year projections for utilization are met, the parties focused on 2006 as the expected third year.  There were indications that, due to the delays involved with litigation, 2006 would not be the **actual** third year of utilization.

**15.** The 23,800 figure is arrived at by adding 16,800 (the minimum number of treatments needed to reach the 80% threshold for the three existing accelerators), plus 3,500 (the minimum number of treatments needed for SRMC's new accelerator in the third year), plus another 3,500 (the minimum number of treatments needed for CCC's new accelerator in the third year).

those projections were underestimated. On the other hand, SRMC argued that a historical review of SEER data compared with actual South Carolina cancer incidence indicated that SEER overestimated cancer incidence by approximately 5 percent.

In the written ALC decision, the ALC phrased the dispositive issue in the case as follows:

Did the Petitioner, CCC, prove by a preponderance of the evidence that [DHEC] erred in its determination that CCC's and SRMC's applications were competing, so that only one additional linear accelerator was needed in the service area composed of Cherokee, Spartanburg and Union Counties and only one application could be approved, or is it feasible and within the guidelines established in the statute, regulations and State Health Plan that both facilities could be approved?

In the numerous findings of facts, the ALC specifically noted Dr. O'Rourke's testimony and found him to be "a very credible witness." The ALC further found his testimony supported the conclusion that the two CON applications were not competing.

In addition to the findings of fact and conclusions of law sections, the ALC's written order included an "Analysis" section. In this section, the ALC found the two CON applications were **not competing** and that both were consistent with the requirements of the State Health Plan. The following is an excerpt from the order:

After reviewing the voluminous exhibits, extensive testimony, and taking into account the totality of circumstances in the tri-county service area in this case, I find that the two applications are not competing because granting both Applications will not exceed the need for linear accelerator facilities and the services which they provide....

The record is replete with evidence that both the aging population and the general class of cancer patients in the tri-county service area—particularly those in the more rural areas—need easier access to radiation treatments. Moreover, the rapidly expanding population in the urban areas of the tri-county region establishes the need for the additional Spartanburg facility.

I find that a preponderance of the evidence establishes that the projected population growth in the service area justifies granting both [CONs], and that the projected growth will enable both facilities to meet the requirement of 3,600 [16] treatments per year for each linear accelerator by their third year of operation. Moreover, I find that the preponderance of the evidence supports the conclusion that each facility is financially feasible.

As stated above, both the Board and the circuit court affirmed the ALC's order that both CONs be issued.[17]

## ISSUES

1. Is there substantial evidence to support the ALC's findings that the CON applications are not competing and both CONs should be issued? (SRMC's appeal)
2. Did the circuit court, Board, and ALC err in granting SRMC's CON application? (CCC's appeal)

## SCOPE OF REVIEW

The ALC presides over the hearing of a contested case from DHEC's decision on a CON application and serves as the finder of fact. *See* S.C.Code Ann. §§ 1–23–600; 44–7–210; *Marlboro Park Hosp. v. S.C. Dep't of Health & Envtl. Control,* 358 S.C. 573, 577, 595 S.E.2d 851, 853 (Ct.App.2004).

On appeal from a contested CON case, the reviewing court "may not substitute its judgment for the judgment of the agency as to the weight of the evidence on questions of fact." S.C.Code Ann. §§ 1–23–380(5). Judicial review of administrative agency decisions is therefore "limited to a determination of whether they are supported by substantial evidence." *Roper Hosp. v. Board of S.C. Dep't of Health and Envtl. Control,* 306 S.C. 138, 140, 410 S.E.2d 558, 559 (1991). After considering the entire record, this Court "need only find ... evidence

16. This is apparently a scrivener's error and should be 3,500.

17. The circuit court affirmed in result only; in addition to affirming the ALC's decision, the circuit court also found that CCC's application "better" met the requirements of the State Health Plan than SRMC's application.

that would allow reasonable minds to reach the conclusion that the administrative agency reached." *Grant v. S.C. Coastal Council*, 319 S.C. 348, 353, 461 S.E.2d 388, 391 (1995) (citation and internal quotation marks omitted).

The Court may, however, reverse or modify the Board's order if the appellant's substantial rights have been prejudiced because the administrative decision is: (a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; (d) affected by other error of law; (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *MRI at Belfair, LLC v. S.C. Dep't of Health & Envtl. Control*, 379 S.C. 1, 6, 664 S.E.2d 471, 473–74 (2008) (citing S.C.Code Ann. § 1–23–380(5)).

### SRMC's Appeal

In its brief, SRMC argues six separate issues on appeal related to the ALC's order. Given our scope of review, however, the determinative issue in this case is whether there is substantial evidence to support the ALC's findings and/or whether the ALC made an error of law. *See* S.C.Code Ann. § 1–23–380(5). More specifically, we must decide whether the ALC's conclusion that the two applications are **not** competing is legally correct. We hold it is.

We note initially that the purpose of the CON Act "is to promote cost containment, prevent unnecessary duplication of health care facilities and services, guide the establishment of health facilities and services which will best serve public needs, and ensure that high quality services are provided in health facilities in this State." S.C.Code Ann. § 44–7–120 (2002).

As noted above, the CON Act defines "competing applicants" as two health care facilities who apply for CONs "to provide similar services or facilities in the same service area within a time frame as established by departmental regulations **and whose applications, if approved, would exceed the need for services or facilities**." S.C.Code Ann. § 44–7–130(5) (emphasis added). It is well-settled that "[t]he con-

struction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons." *Dunton v. S.C. Bd. of Examiners in Optometry,* 291 S.C. 221, 223, 353 S.E.2d 132, 133 (1987).

The ALC found that granting both CON applications would **not** exceed the need, and therefore, the applications were **not** competing. From a factual perspective, there is abundant evidence in the record to support this based on CCC's data projections. Moreover, it is hard to interpret the plain language of section 44–7–130(5) any other way than the manner in which the ALC interpreted it: If granting both applications would not exceed the need, then the applications are not competing and both may be granted (provided all other relevant criteria are met). *See Brown v. S.C. Dep't of Health and Envtl. Control,* 348 S.C. 507, 515, 560 S.E.2d 410, 414 (2002) ("Where the terms of the statute are clear, the court must apply those terms according to their literal meaning.").

The ALC also specifically found that both SRMC and CCC met the relevant project criteria. Again, there is an abundance of evidence to support this finding. While the ALC correctly noted that each proposed project has its strengths and advantages, this does not mean the other completely lacks merit.

Accordingly, we affirm the decision to grant both CONs. We find the evidence substantially supports the legal conclusion that the two applications were not competing. Moreover, based on the evidence presented, the granting of both CONs does not violate the State Health Plan and will further the overall purpose of the statute. *See* § 44–7–120.

We have reviewed SRMC's individual arguments raised on appeal and find that two merit brief discussion. First, SRMC argues the ALC failed to make specific findings of fact.

█ This Court has made clear that "[t]he findings of fact of an administrative body must be sufficiently detailed to enable the reviewing court to determine whether the findings are supported by the evidence and whether the law has been properly applied to those findings." *Able Communications, Inc. v. S.C. Pub. Serv. Comm'n,* 290 S.C. 409, 411, 351 S.E.2d 151, 152 (1986). To simply recite conflicting testimony is

insufficient. *Id.* In *Able,* the Public Service Commission's order contained no findings of fact at all and a conclusory finding that the proposed paging service rates were reasonable. The *Able* Court held that appellate review was "impossible" because all it could do was speculate as to "the reasons underlying the decision." *Id.*

■ SRMC argues the ALC failed to "choose" one set of data projections over another and therefore ran afoul of the *Able* holding.˙ We disagree. The ALC's order was far from conclusory. There are findings of fact, credibility determinations, conclusions of law, and legal analysis in the written order. Although SRMC correctly notes that in the findings of fact section the ALC lists both sets of data projections, the legal analysis outlined in the ALC order demonstrates an acceptance of CCC's predictions and specifically reflects that the ALC took into account the aging population. Only CCC's data projections separated the data by age cohorts. Therefore, we need not speculate about why the ALC reached the decision it did because the written order makes the reasons manifest. In other words, the rule outlined in *Able* and its progeny has not been breached.

■ SRMC also argues the circuit court order must be vacated because it included improper findings of fact and credibility determinations. We agree. Because the circuit court was sitting in an appellate capacity, it was bound by the same scope of review discussed above. It was error for the circuit court to go beyond that scope and make additional findings.

Accordingly, we affirm as modified and vacate the circuit court order. The Board's decision which affirmed the ALC's ruling to issue both CONs stands.

### CCC's Appeal

Although CCC acknowledges in its brief that: (1) the appropriate standard of review is the substantial evidence test, and (2) it offered evidence there was sufficient need in the tri-county area for two linear accelerators, CCC nevertheless argues it was error to grant SRMC's CON application. However, because CCC does not challenge the ALC's ruling that the applications are non-competing, its argument about which

application is "better" is irrelevant. We find CCC's argument wholly meritless. As discussed at length above, the ALC order which granted **both** CON applications is well supported by substantial evidence.

## CONCLUSION

We vacate the circuit court's order but affirm the Board's decision which in turn affirmed the ALC's written order to grant both CONs.

**AFFIRMED AS MODIFIED.**

PLEICONES, KITTREDGE, JJ., and Acting Justice JAMES E. MOORE, concur.

TOAL, C.J., dissenting in a separate opinion.

Chief Justice TOAL.

I respectfully dissent from the majority's opinion and would reverse the circuit court's decision affirming in result the decisions of the DHEC board and the ALC.

The Administrative Procedures Act specifically requires an agency's order in a contested case to "include findings of fact and conclusions of law . . . ." S.C.Code Ann. § 1–23–350 (2005). "The findings of fact of an administrative body must be sufficiently detailed to enable the reviewing court to determine whether the findings are supported by the evidence and whether the law has been properly applied to those findings." *Able Comm'ns, Inc. v. S.C. Pub. Serv. Comm'n,* 290 S.C. 409, 411, 351 S.E.2d 151, 152 (1986) (citation omitted). "This Court will not accept an administrative agency's decision at face value without requiring the agency to explain its reasoning." *Kiawah Prop. Owners Group v. Pub. Serv. Comm'n of S.C.,* 338 S.C. 92, 96, 525 S.E.2d 863, 865 (1999).

"Where material facts are in dispute, the administrative body must make specific, express findings of fact." *Able Comm'ns, Inc.,* 290 S.C. at 411, 351 S.E.2d at 152 (citation omitted). "Implicit findings of fact are not sufficient." *Id.* "[A] recital of conflicting testimony followed by a general conclusion is patently insufficient to enable a reviewing court to address the issues." *Id.* As a result, "[i]t is impossible for

an appellate court to review the order for error, since the reasons underlying the decision are left to speculation." *Id.; see also Grant v. Grant Textiles,* 372 S.C. 196, 641 S.E.2d 869 (2007) (reversing Workers' Compensation Commission in part because the full commission failed to set forth the underlying facts upon which it relied to support its conclusion); *Kiawah Prop. Owners Group,* 338 S.C. 92, 525 S.E.2d 863 (finding it impossible for this Court to review public service commission orders that merely recite each party's general position on the issue and then announce the one it chooses to follow); *Porter v. S.C. Pub. Serv. Comm'n,* 333 S.C. 12, 507 S.E.2d 328 (1998) (reversing public service commission's decision on the rate of return on common equity because that decision was not adequately documented in the findings of fact).

In this case, the majority points out that the ALC's order lists both sets of data projections in the findings of fact section. However, the ALC's order never explicitly makes a finding of fact indicating which data projections were ultimately relied upon in making its decision. The lack of explicit findings of fact clearly does not meet the standards set forth in *Able* and its progeny. The only way to arrive at a finding of fact concerning data projections is to imply that the ALC relied on CCC's data projections. However, *Able* states that implicit findings of fact are not sufficient. *Able Comm'ns, Inc.,* 290 S.C. at 411, 351 S.E.2d at 152. Thus, it is impossible for this Court to review the order for error because the reasons underlying the decision are left to speculation.

The circuit court sits as a reviewing court that must determine if the ALC's decision is supported by substantial evidence in the record. *See* S.C.Code Ann. § 1–23–380 (Supp. 1998).[18] While the circuit court attempted to salvage the ALC order, the circuit court's determinations are also speculative at best. The circuit court should have remanded the order so that the ALC could have fulfilled its responsibilities to the parties. It is not the circuit court's responsibility to create an acceptable order when the ALC fails to do so. *See Kiawah Prop. Owners Group,* 338 S.C. at 97, 525 S.E.2d at 865.

---

**18.** The procedure for reviewing decisions by the ALC under section 1–23–380 has changed to allow for appeals to the court of appeals instead of the circuit court. *See* S.C.Code Ann. § 1–23–380 (Supp.2008).

In conclusion, because the ALC's order does not meet the standards set forth in *Able* and its progeny by not expressly finding facts indicating which data projections were ultimately relied upon in making its decision, I would reverse the circuit court's decision affirming in result the decisions of the DHEC board and the ALC.